IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-00579-BO

| | |
|---|---|
| **Tacho M. Sandoval**, | |
| Plaintiff, | |
| v. | **Order** |
| **John Does 1–3**, | |
| Defendants. | |

Plaintiff Tacho M. Sandoval claims that three users of an internet message board have sullied his reputation by falsely accusing him of securities fraud. But he does not know who to name as defendants since the statements' authors are known only by their pseudonymous usernames. To remedy this problem, Sandoval sought permission to subpoena the message board to learn who made the defamatory statements. The court allowed him to do so but allowed the authors to challenge the subpoenas before iHub disclosed their identities.

One of the Defendants, who is known by the nom de plume Cartman_3_16, has taken the court up on that invitation. He asks the court to quash the subpoena directed at his information for two reasons. He first argues that the court lacks subject-matter jurisdiction since the complaint does not establish complete diversity between the parties. And then he argues that revealing his identity would violate his First Amendment rights.

The court disagrees with both arguments. The court has subject-matter jurisdiction at this point because the complaint establishes minimal jurisdiction between the parties. Thus the court can authorize discovery to learn the Defendants' names.

And, ultimately, the First Amendment does not prevent Sandoval from learning Cartman's identity. Both Fourth Circuit precedent and the First Amendment's original public meaning establish that, based on the facts here, the amendment provides only limited protection for Cartman's identity. Given that Sandoval has stated a defamation claim against Cartman, his right to pursue his claim trumps Cartman's right to anonymity.

So the court will deny the motion to quash and require the disclosure of Cartman's identity. The court will, however, limit the dissemination of Cartman's identity to ensure that the loss of the right to anonymity goes no further than necessary to allow Sandoval to pursue his claim.

## I.    Background

Investorshub.com (iHub) is a website that allows its users to "gather and share market insights in a dynamic environment using an advanced discussion platform." About Investors Hub, https://investorshub.advfn.com/boards/about.aspx (last visited Oct. 27, 2021). One aspect of that discussion platform is a message board about Clean Coal Technologies, Inc. Compl. ¶ 1, D.E. 1.

Sandoval claims that three posters on the CCTI message board—Cartman, Fullest_Disclosure, and MoMoneyRules—defamed him by falsely accusing him of securities fraud. *Id.* ¶¶ 1, 11. As for Cartman, the allegedly defamatory post said:

> As if "because it's the law" has ever been management's guiding force.
>
> What a joke. They must think shareholders are morons, especially after that little paid pump they executed last fall with slimy insider Nacho Sandoval[1].

*Id*. ¶ 43.

---

[1] Sandoval claims that Cartman's use of the first name Nacho is a "racist and deprecatory reference to Mr. Tacho Sandoval (who is of Latin heritage)[.]" Compl. ¶ 44.

2

This statement, Sandoval claims, alleges that he "participated in illegal securities fraud with [CCTI] by manipulating the company's" share price "through a 'pump they executed last fall[.]" *Id.* ¶ 45. Sandoval says that this suggestion is false and that he has "never engaged in any form of market manipulation with his [CCTI] shares, including the alleged 'pumping' or 'dumping' of his shares, neither alone, nor in concert with [CCTI]." *Id.* ¶ 72. He also claims that Cartman's statement has damaged his "professional and personal reputations" and will continue to do so. *Id.* ¶ 74.

After suing, Sandoval asked the court to allow him to subpoena iHub to learn the Defendant's identities. Mot. for Leave to Conduct Early Discovery, D.E. 12. The court did so but allowed the Defendants to challenge the subpoenas before iHub revealed their identities. Jan. 25, 2021 Order, D.E. 14.

And Carman did just that. He moved to quash the subpoena arguing that the court lacked jurisdiction and that Sandoval had not shown that he has a right to learn Cartman's identity. D.E. 18. Sandoval responded and the court held a hearing on the matter. After reviewing the parties' arguments, the court denies Cartman's motion.

## II. Analysis

Cartman asks the court to quash the subpoena requiring iHub to disclose his identity and related information to Sandoval for two reasons. He first claims that the court lacks subject-matter jurisdiction since the complaint does not establish complete diversity between the parties. Next he argues that disclosing his identity would violate his First Amendment right to speak anonymously since Sandoval has not established a prima facie case of defamation against him. For the reasons described below, neither argument is persuasive.

3

## A. The complaint's allegations of minimal diversity provide the court with jurisdiction to authorize pre-service discovery.

Cartman says the court should quash the subpoena because it lacks subject-matter jurisdiction over this case.[2] He points out that the complaint does not describe his citizenship or the citizenship of MoMoneyRules. According to Cartman, since Sandoval has not affirmatively alleged complete diversity between the parties, he has not established that the court has subject-matter jurisdiction over the dispute. Cartman believes that shortcoming entitles him to have the subpoena quashed.

But this argument is unpersuasive. The complaint alleges (and Cartman does not contest) that there is at least minimal diversity between the parties. Given that fact, the court has the authority to allow discovery on jurisdictional issues, such as the citizenship of parties. Plus, the court has tools available to address the presence of non-diverse defendants. So Cartman's jurisdictional concerns do not provide a basis to quash the subpoena.

Unlike their state counterparts, federal courts have jurisdiction over only a limited set of cases and controversies. They are "constrained to exercise only the authority conferred by Article III of the Constitution and affirmatively granted by federal statute." *In re Bulldog Trucking, Inc.*, 147 F.3d 347, 352 (4th Cir. 1998). And when questions arise over the existence of subject-matter jurisdiction, the party invoking the court's authority must prove that the court can hear the case. *Adams* v. *Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

Sandoval claims this court has jurisdiction to hear this case through what is known as diversity jurisdiction. Compl. ¶ 2. Diversity jurisdiction exists if the amount at issue exceeds

---

[2] Cartman also argued that the court lacked personal jurisdiction over him, but he withdrew that argument at the hearing on his motion.  Hr. Tr. at 10:1-15, D.E. 30.

4

$75,000 and the opposing parties are citizens of different states. 28 U.S.C. § 1332. If a party is a natural person, the court will consider the party a citizen of a state if the party is "both a citizen of the United States and a domiciliary of that State." *Johnson* v. *Advance Am.*, 549 F.3d 932, 937 n.2 (4th Cir. 2008). A party is a domiciliary of a state where they have a "physical presence" and an "intent to make the State a home." *Id.* Diversity jurisdiction also requires complete diversity between the parties, meaning each plaintiff must be a citizen of a different state than each defendant. *Strawbridge* v. *Curtiss*, 7 U.S. (3 Cranch) 267 (1806).

Cartman says that the complaint does not establish diversity jurisdiction. He points out that it is silent about his citizenship and the citizenship of MoMoneyRules. Thus, the argument goes, Sandoval has not shown that there is complete diversity and, as a result, the court lacks jurisdiction over this dispute.

In support of his position Cartman offers two cases from the District of Columbia. He first points to *Vogel* v. *Go Daddy Group, Inc.*, 266 F. Supp. 3d 234 (D.D.C. 2017), an opinion involving a motion to amend a complaint. Vogel initially sued GoDaddy and four John Doe defendants for defamation. *Id.* at 236. While Vogel tried to learn the Doe Defendants' identities through pre-service discovery, an amici challenged the court's jurisdiction. *Id.* It argued that the complaint "does not allege complete diversity amongst the parties; GoDaddy purportedly is immune from suit, and diversity jurisdiction does not exist when the only remaining defendants are the unnamed Doe Defendants." *Id.* This was a problem because, as the court noted, a case "invoking a federal court's diversity jurisdiction cannot be brought solely against Doe defendants because their place of citizenship is not known." *Id.* at 238.

In response, Vogel asked to amend his complaint to dismiss GoDaddy and add information about the citizenship of the Doe Defendants based on the IP addresses he uncovered through

5

discovery. *Id.* at 237. For reasons not relevant here, the court held that he could not rely on the IP addresses to establish the Doe Defendants' citizenship. *Id.* at 240. It then concluded that it lacked jurisdiction because Vogel "ha[d] not plausibly alleged whether the Doe Defendants are citizens of states other than" his own. *Id.* at 240.

The court also rejected Vogel's request to conduct more discovery to learn the Doe Defendants' citizenship. It noted that it "originally could allow Plaintiff to take early discovery because GoDaddy's presence as a defendant created diversity jurisdiction." *Id.* at 240. But since the proposed amended complaint no longer included GoDaddy, that diversity of citizenship no longer existed. *Id.* Thus, Vogel could not "continue to use the tools of discovery otherwise available to a plaintiff properly in federal court to uncover the requisite jurisdictional facts." *Id.* at 240–41. The court then dismissed the action for lack of subject-matter jurisdiction. *Id.* at 241.

Cartman also relies on *Sinclair* v. *TubeSockTedD*, 596 F. Supp. 2d 128 (D.D.C 2009). In *Sinclair*, the plaintiff subpoenaed three websites to learn the identity of individuals who allegedly defamed him. *Id.* at 130. While addressing motions related to the subpoenas, the court considered whether it had subject-matter jurisdiction given that "the citizenship of the defendants—all anonymous 'Does'—is not known." *Id.* at 132. It noted that a party cannot bring "a diversity action . . . against Doe defendants in hopes of later discovering that the requisite diversity of citizenship actually exists." *Id.* at 132–33. Given that "the face of the complaint" demonstrated a "total absence of subject-matter jurisdiction" the court dismissed the action. *Id.* at 134.

Based on *Vogel* and *Sinclair*, Cartman argues that Sandoval cannot use the federal discovery process "to fish for subject matter jurisdiction where there is no basis to believe it exists." Mem. in Supp. of Mot. to Quash at 5.

6

But this case presents a different factual scenario than either *Vogel* or *Sinclair*. Sandoval alleges that Fullest_Disclosure "is a resident of Wake Forest, and a citizen of the State of North Carolina." Compl. ¶¶ 2, 6. The court must accept this allegation as true at this stage of the proceeding. *See Adams*, 697 F.2d at 1219 (explaining that when a court considers allegations that "a complaint simply fails to allege facts upon which subject matter jurisdiction can be based . . . all the facts alleged in the complaint are assumed to be true[.]"). So while the complaint does not establish complete diversity, it establishes minimal diversity between the parties. *See Navy Fed. Credit Union* v. *LTD Fin. Servs., LP*, 972 F.3d 344, 352 (4th Cir. 2020) (explaining that minimal diversity exists "where the citizenship of any plaintiff differs from that of any defendant.").

As noted in *Vogel*, the existence of minimal diversity allows the court to authorize pre-service discovery. *Vogel*, 266 F. Supp. 3d at 240. This conclusion aligns with the long-standing practice of allowing a court to decide whether it has jurisdiction over a case. *See Kearns* v. *United States*, 585 F.3d 187, 192–93 (4th Cir. 2009) (explaining that "vesting a district court with the discretion to determine whether it possesses jurisdiction generally presents no problems."). Often this process involves allowing discovery while the court's jurisdiction is still in question. *See Cunningham* v. *Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 650–51 (4th Cir. 2018) (discussing the use of "six subpoenas, four Touhy requests, numerous other document requests, [and] six depositions" as part of assessing whether subject-matter jurisdiction existed); *Mylan Lab'ys, Inc.* v. *Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993); *Napper* v. *United States*, 374 F. Supp. 3d 583, 587 (S.D.W. Va. 2019) ("Reasonable discovery may be necessary to permit the party seeking jurisdiction to produce the facts and evidence necessary to support their jurisdictional allegations.").

7

On top of that, if it turns out that a Defendant is a New York citizen, that does not mean that the court will instantly dismiss the case. Courts have tools to address the presence of a party whose citizenship would destroy diversity jurisdiction. For example, "Rule 21 invests district courts with authority to allow a dispensable nondiverse party to be dropped at any time[.]" *Newman-Green, Inc.* v. *Alfonzo-Larrain*, 490 U.S. 826, 832 (1989). So if Cartman's citizenship makes it impossible for there to be complete diversity, the court can drop him from the case. *Id.* *See Grupo Dataflux* v. *Atlas Glob. Grp., L.P.*, 541 U.S. 567, 573 (2004). The court could also require Sandoval to choose between dismissing a non-diverse party or having the entire case dismissed.

So while it is still to be determined whether there is complete diversity between the parties, the existence of minimal diversity authorizes the court to allow Sandoval to engage in discovery to learn the defendants' identities. Thus, jurisdictional issues do not provide a basis to quash the subpoena.

### B. Revealing Cartman's identity will not violate his First Amendment right to speak anonymously since Sandoval has stated a claim for defamation.

Cartman's other argument focuses on the First Amendment.[3] That amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press[.]" U.S. Const. amend. I. He asserts that this language provides him with a constitutional right to speak anonymously. And he claims that requiring iHub to identify him before Sandoval has established a prima facie case against him violates that right. Sandoval responds that he only needs to state a claim for defamation before the First Amendment allows him to learn Cartman's identity.

---

[3] Cartman bears the burden of proof and persuasion on this point. *Va. Dep't of Corrs.* v. *Jordan*, 921 F.3d 180, 189 n.2 (4th Cir. 2019).

So the question here is not whether the First Amendment provides Cartman a right to speak anonymously. Instead, the relevant question is what showing Sandoval must make at the outset of the case to overcome that right. Neither the Supreme Court nor the Fourth Circuit have squarely addressed this question. And while courts around the nation have considered it, they have not coalesced around an answer. The standards courts have applied "range from a 'good faith' assertion of a claim for relief to a showing commensurate with that needed to withstand a motion for summary judgment." *Taylor* v. *John Does 1–10*, Case No. 4:13-CV-00218-F, 2014 WL 1870733, at *2 (E.D.N.C. May 8, 2014). It is unsurprising then that the parties also disagree on the standard the court should apply.

Given that the standards provide varying levels of protection to anonymous speech, selecting the proper standard requires assessing how strongly the First Amendment protects Cartman's right to anonymity in the face of a defamation claim. If it provides a high level of protection, the prima facie standard would be appropriate. But if it provides minimal protection, then the court should apply the motion to dismiss standard.

So how does the court determine which standard to apply? As a federal trial court, the first place this court should look to is the precedent of the Supreme Court and the Fourth Circuit Court of Appeals. *See Edmo* v. *Corizon, Inc.*, 949 F.3d 489, 506 (9th Cir. 2020) (Bumatay, J., dissenting from denial of rehearing en banc). If one of those courts has spoken to the issue at hand, this court is duty bound to follow their holding. *Id.*

But when, as here, precedent does not compel a particular outcome to a constitutional question the court has a "duty to interpret the Constitution in light of its text, structure, and original understanding." *NLRB* v. *Noel Canning*, 573 U.S. 513, 573 (2014) (Scalia, J., concurring). In doing so, the court will attempt to "discern the most likely public understanding of [the First Amendment]

9

at the time it was adopted." *McDonald* v. *City of Chicago, Ill.*, 561 U.S. 742, 828 (2010) (Thomas, J., concurring in part and concurring in judgment).

So the court will first look to precedent for an answer. And since there is no controlling precedent on this issue, it will consider whether those who ratified the First Amendment would have understood it to protect an individual's right to remain anonymous in the face of a libel claim.

> **1.**     **The Fourth Circuit's *Lefkoe* opinion suggests that the First Amendment provides a limited level of protection for anonymous commercial speech.**

In its opinion in *Lefkoe* v. *Jos. A. Bank Clothiers, Inc.*, 577 F.3d 240 (4th Cir. 2009), the Fourth Circuit provided guidance on how the First Amendment applies to attempts to unmask an anonymous speaker. *Lefkoe* involved allegations that the defendant company "and insiders issued a series of false and misleading statements about the company's earnings, profits, and inventory and thereby allowed the insiders to profit from inflated stock prices." *Id.* at 242. The plaintiffs alleged that they lost "tens of millions of dollars" when the "true facts were disclosed[.]" *Id.*

Among the events preceding this suit was the receipt by the company's audit committee of a letter from a Boston-based law firm on behalf of an unidentified shareholder. *Id.* The letter contained "multiple allegations regarding the handling, accounting, and reporting of inventory." *Id.* at 242–43. The investigation into these allegations and a resulting delay in "its earnings report and call" caused the company's stock to lose almost 6 percent of its value. *Id.* at 243. Shareholders sued the company in the District of Maryland three months later. *Id.*

As part of discovery, a Massachusetts federal court allowed the company to subpoena the law firm to learn "the identity of and other information about" the anonymous client. *Id.* at 243. While the firm's attempt to quash the subpoena on First Amendment grounds failed, the

10

Massachusetts court prohibited the attorneys from disclosing the anonymous client's identity to anyone, including the parties, unless the Maryland federal court allowed it. *Id.* at 244.

Eventually, the Maryland court allowed the parties to learn the identity of the anonymous client but prohibited any further disclosure. *Id.* at 245. The anonymous client appealed the order allowing the broader dissemination of his identity. *Id.*

Among the anonymous client's arguments was that the Maryland district court's order violated his "fundamental First Amendment right to speak anonymously" by allowing the further disclosure of his identity. *Id.* at 247. In assessing this claim, the court focused on the type of speech in the letter. *Id.* at 248. It determined that the letter contained commercial speech and thus the anonymous client's "First Amendment right to speak anonymously 'enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values[.]" *Id.* This meant that the right was "subject to modes of regulation that might be impermissible in the realm of noncommercial expression.'" *Id.* (quoting *Bd. of Trs. of SUNY* v. *Fox*, 492 U.S. 469, 477 (1989)). The court determined that it could require disclosure of an otherwise anonymous speaker so long as there was "a substantial governmental interest in disclosure" and the disclosure "goes no further than reasonably necessary" to advance that interest. *Id.* at 249.

The appellate court then held that the Maryland court's order met this standard. Since the anonymous client's identity and his knowledge were relevant to the case, "the substantial governmental interest in providing Jos. A. Bank a fair opportunity to defend itself in court is served by requiring the [anonymous client] to reveal its identity and provide the relevant information." *Id.* It bolstered this conclusion by noting that the Federal Rules explicitly allowed the company to learn the identity of people who know of any discoverable matter. *Id.* (citing Fed. R. Civ. P. 26(b)(1)). So it affirmed the lower court's order. *Id.* at 249.

11

While *Lefkoe* helps explain the extent of the right to anonymous speech, it does not squarely address the question in this case. The Fourth Circuit noted that it was not addressing "whether partial disclosure of its identity—i.e. disclosure to the attorneys on this case—compromised its claimed right to complete anonymity[.]" *Id.* at 248. While the case presented "a similar issue," the appellate court was only addressing whether allowing "*further disclosure*" of the anonymous client's identity would violate the First Amendment. *Id.* at 247–48 (emphasis in original). So *Lefkoe* does not resolve this issue.

> ### 2. Founding era sources suggest that the First Amendment provided little protection to an anonymous speaker accused of libel.

The court next turns to what the original understanding of the First Amendment reveals about Sandoval's attempt to unmask Cartman and pursue a claim of libel against him. As a general matter, at the time of its ratification, the First Amendment provided little protection to libelous speech. Instead, libel was one of the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 571–72 (1942). *Accord McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 372 (1995) (Scalia, J., dissenting) ("There is no doubt, for example, that laws against libel and obscenity do not violate 'the freedom of speech' to which the First Amendment refers; they existed and were uniformly approved in 1791.")

In fact, both before and at the time of ratification, state law allowed for the punishment of libel. In the period before "the Revolution, the American Colonies had adopted the common law of libel." *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 381 (1974) (White, J., dissenting). And since "[l]ibel of an individual was a common-law crime" it was "criminal in the colonies." *Beauharnais* v. *Illinois*, 343 U.S. 250, 254 (1952).

The ratification of the First Amendment did not change this understanding. In fact, "[s]cant, if any, evidence exists that the First Amendment was intended to abolish the common law of libel, at least to the extent of depriving ordinary citizens of meaningful redress against their defamers." *Gertz*, 418 U.S. at 381 (White, J., dissenting) (citing 2 T. Cooley, *Constitutional Limitations* 883 (8th ed. 1927)). And it was widely understood that allowing "these common-law actions did not abridge freedom of the press." *Id.* at 381–82 (citing L. Levy, *Legacy of Suppression: Freedom of Speech & Press in Early Am. Hist.* 247–48 (1960); Merin, *Libel & the Sup. Ct.*, 11 Wm. & Mary L. Rev. 371, 376 (1969); Hallen, *Fair Comment*, 8 Tex. L. Rev. 41, 56 (1929)).

Early state practice reflects this fact. By 1792, "10 of the 14 States that had ratified the Constitution . . . had themselves provided constitutional guarantees for free expression, and 13 of the 14 nevertheless provided for the prosecution of libels." *Id.* at 380–81 (White, J., dissenting) (citing *Roth* v. *United States*, 354 U.S. 476, 482 (1957)).

Nor did founding-era courts consider the First Amendment as a bar to individuals pursuing libel claims. Although "courts acknowledged that the freedom of speech and press may apply to civil lawsuits as well as to criminal prosecutions," they "reasoned that libelous speech was a constitutionally unprotected abuse of the freedom and could thus lead to civil liability as well as to criminal punishment." Eugene Volokh, *Tort Liab. & the Original Meaning of the Freedom of Speech, Press & Petition*, 96 Iowa L. Rev. 249, 253 (2010). *Accord Dexter* v. *Spear*, 7 F. Cas. 624 (No. 3,867) (CCDRI 1825) (Story, J.) ("The liberty of speech and the liberty of the press do not authorize malicious and injurious defamation.").

There were some instances, however, where courts made exceptions in the context of political speech. For example, in the early 1800s, "the highest courts of Vermont and South Carolina reversed libel verdicts for the plaintiffs, holding that the state equivalents of the Petition

13

Clause generally barred recovery for alleged libels in petitions to the legislature." Volokh, *supra* at 251. Similarly, "[i]n 1808, the Massachusetts Supreme Judicial Court . . . held that state legislators' freedom of speech and debate could bar civil liability for slanderous statements made 'while discharging the duties of [the legislator's] office[.]'" *Id.* at 254.

Many prominent legal commentators supported the view that libel fell outside the First Amendment's protections. For example, in his Commentaries on the Law of England, William Blackstone noted that "[t]he liberty of the press is indeed essential to the nature of a free state[,]" yet if someone "publishes what is improper, mischievous, or illegal, he must take the consequence of his own temerity." 4 W. Blackstone, *Commentaries on the Laws of England* 151–152 (1769). And other commentators of the founding era similarly "concluded that libel was generally constitutionally unprotected, both against civil and criminal punishment." Volokh, *supra* at 255–57.

So there is little question that during the founding era it was understood that the First Amendment did not hamper a plaintiff's attempts to bring a libel claim. And the court has uncovered no authority suggesting that the First Amendment's ratifiers would have understood it to prevent a court from requiring the disclosure of a libeler's identity. To the contrary, there is evidence that founding era courts allowed the use of compulsory process to discover the identity of an anonymous libeler. *See* Robert G. Natelson, *Does "The Freedom of the Press" Include a Right to Anonymity? The Original Meaning*, 9 N.Y.U. J. L & Liberty, 160, 195–198 (explaining that "officials could require disclosure of an author's name . . . when a writing presumptively fell within one of the recognized exceptions" to freedom of the press.).

So based on the available information, it appears that the founding-era public would not have understood the First Amendment to prevent a plaintiff from using compulsory process to learn an alleged libeler's identity, at least outside the political realm.

### 3. Both precedent and the First Amendment's original public meaning suggest applying the motion to dismiss standard.

Both of the sources the court looks to for guidance on this question suggest that it should apply the motion to dismiss standard. As noted above, at the time of the First Amendment's ratification, it was widely understood that the amendment did not prevent an individual from pursuing a libel claim. To the contrary, the idea that a speaker could be and should be held accountable for defamatory speech was widely accepted. And there is an indication that courts would allow the use of compulsory process to allow parties to learn the identity of an anonymous libeler. So these factors suggest that the First Amendment would provide only limited protection for Cartman's right to speak anonymously in the face of Sandoval's libel claim.

The Fourth Circuit's *Lefkoe* opinion points to the same conclusion. Of course, the appellate court said that it was not addressing the standard that would apply to an initial disclosure of an anonymous speaker's identity. Yet this court cannot see any reason why a different analysis would apply to the initial disclosure question. The nature of the speech at issue—and thus the level of protection the First Amendment provides—does not change based on the stage of the case. So there would be no reason to apply a different analysis to the first disclosure than is applied to later disclosures.

Given that, *Lefkoe* supports applying the motion to dismiss standard. Cartman's speech dealt with his economic interests and the economic interest of his audience, thus his statement is commercial speech. *Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557,

15

561 (1980). Thus, Cartman's right to speak anonymously will give way in the face of a "substantial governmental interest in disclosure so long as disclosure advances that interest and goes no further than reasonably necessary." *Lefkoe*, 577 F.3d at 249.

Sandoval's request to learn Cartman's identity implicates a substantial government interest: the federal government's interest in providing a forum for parties to resolve their disputes. *See, e.g.*, *Borough of Duryea* v. *Guarnieri*, 564 U.S. 379, 387 (2011) ("[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government."); *Nanni* v. *Aberdeen Marketplace, Inc.*, 878 F.3d 447, 457 (4th Cir. 2017) ("[A] citizen's 'right to sue and defend in the courts is one of the highest and most essential privileges of citizenship and is granted and protected by the Federal Constitution.'"); *AMA Multimedia LLC* v. *Wanat*, No. CV-15–01674-PHX-ROS, 2017 WL 5668025, at *9 (D. Ariz. Sept. 29, 2017) ("[T]he United States has an interest in adjudicating AMA's claims because it has a substantial interest in providing a forum for copyright holders to seek redress."), *aff'd*, 970 F.3d 1201 (9th Cir. 2020). Allowing Sandoval to learn Cartman's identity will further that interest by providing him with the necessary information to serve Cartman with process and move this case forward.

But this right does not apply to every litigant who walks away from the courthouse with a file-stamped complaint. Although decided in another context, courts have recognized that the right of access to the courts only comes into play once "the named plaintiff . . . identif[ies] a nonfrivolous, arguable underlying claim[.]" *Christopher* v. *Harbury*, 536 U.S. 403, 415 (2002) (quotations omitted). This limitation establishes that Sandoval must state a claim before his right to pursue his claim trumps Cartman's right to anonymity.

16

So based upon the Fourth Circuit's *Lefkoe* decision and the First Amendment's original public meaning, the court finds that the motion to dismiss standard will guide its analysis of this issue.

### C. Sandoval plausibly alleged a defamation per se claim under New York law.

So to have a right to learn Cartman's identity, Sandoval must show that his complaint states a claim for defamation. To meet this standard, Sandoval's complaint, "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). The Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* But mere "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A claim of defamation under New York Law has five elements. First, there must be "a written defamatory statement of and concerning the plaintiff[.]" *Palin* v. *New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). Second, the defendant must publish the statement to a third party. *Id.* Third, there must be the requisite level of fault depending on the defendant's status. *Id.* Fourth the allegedly defamatory statement must be false. *Id.* And fifth, there must be allegations of special damages or the statement must be defamatory per se. *Id.*

Cartman poses four challenges to the sufficiency of Sandoval's claim against him.[4] To begin with, he argues that the statement is not actionable because it is a statement of opinion, not

---

[4] Cartman had originally argued that Sandoval was a limited-purpose public figure. Mem. in Supp. of Mot. to Quash at 7–9. But he withdrew that argument at the hearing on his motion. Hr. Tr. at 31:2-11.

17

fact. Next, he claims that the defamation claim fails because he has not shown that Cartman was grossly incompetent when he made the allegedly defamatory statement. Then he argues that Sandoval has not shown the statement to be false. And finally he contends that his statement does not support a claim of per se defamation.

### 1. The context of Cartman's paid pump statement establishes that is was factual.

Cartman claims that he cannot be held liable for defamation because his statement was one of opinion, not fact. This distinction is important because while factual statements are actionable, statements of opinion are not. *Gross* v. *New York Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993). But Sandoval maintains, and the court agrees, that the statement is factual.

New York courts consider three factors when assessing if a statement is fact or opinion. At first, they look to "whether the specific language in issue has a precise meaning which is readily understood[.]" *Id.* Then they assess "whether the statements are capable of being proven true or false[.]" *Id.* And finally they evaluate "whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id.* (quotations and alterations omitted). Cartman focuses on the last factor, arguing that the context of his statement renders it opinion, not fact.

### a) Statements on the internet can support a defamation claim and Cartman has not explained why statements on iHub should more readily be considered opinion instead of fact.

Cartman begins by arguing that the fact that he made the statement on the internet, "counsels in favor of a statement being one of opinion." Mem. in Supp. of Mot. to Quash at 6. He points to *Sandals Resorts Int'l Ltd.* v. *Google, Inc.*, 925 N.Y.S.2d 407 (N.Y. App. Div. 2011), a

18

trial court decision, to support this argument. In that case, the court noted, "The culture of Internet communications, as distinct from that of print media, has been characterized as encouraging a freewheeling, anything-goes style, and readers give less credence to allegedly defamatory remarks published on line than to similar remarks made in other contexts." *Id.* at 415–16.

It is unclear what evidence supports the court's conclusion. But even if it were true, that does not mean that there is blanket immunity for statements made on the internet. To the contrary, several New York courts have found that statements on the internet can provide the basis for a libel claim. *See Solstein* v. *Mirra*, 488 F. Supp. 3d 86, 100–01 (S.D.N.Y 2020) (citing cases).

So the fact that Cartman made his statement on the internet does not automatically mean that it is opinion. Instead, a court must still consider "the context of the forum where the statements were made[.]" *Bellavia Blatt & Crossett, P.C.* v. *Kel & Partners LLC*, 151 F. Supp. 3d 287, 296 (E.D.N.Y. 2015).

Cartman has not pointed to anything in the complaint showing that iHub users are more likely to consider statements on the CCTI message board to be opinion instead of fact. And several aspects of the complaint counsel against such a conclusion. For example, the message board allows users to discuss matters relevant to CCTI's investors. *See, e.g.*, Compl. ¶¶ 14, 21, 23, 29, 35, 39. It can be expected that those seeking investment advice are looking for reliable information, not merely the random musings of strangers on the internet. Along with comments by users, the message board also provides the current stock price of the company at issue, the stock price over time, links to quarterly reports, and links to news articles. Compl. Ex. I. While no doubt there will be statements of opinion on iHub, based on the information before the court, it also contains a fair amount of factual information.

The court also notes that Cartman serves as a moderator on the iHub message boards. Compl. Ex. I at 2, D.E. 1–9 (stating under Cartman's username "Boards Moderated 2). Cartman's position of authority in the iHub community could lend additional credibilty to his statements. So the fact that Cartman made his statement on the internet carries limited weight in this analysis.

> **b)** **While Cartman uses some figurative language, as a whole, the tenor of his statement supports a finding that he was stating fact, not opinion.**

Next Cartman focuses on the tenor of his comments. He says the court should consider his statements to be opinion because "[t]he content, tone, and purpose of the communication signals to readers that the entire statement is [his] opinion." Mem. in Supp. of Mot. to Quash at 7. To support this position, he points to his use of "rhetorical hyperbole" about management's belief that shareholders are morons, and that Sandoval is a slimy insider. *Id.*

While not discussed in detail in his brief, Cartman suggested at the hearing on his motion that the New York Court of Appeals' decision in *600 West 115th St. Corp.* v. *Von Gutfeld*, 80 N.Y.2d 130 (N.Y. 1992), supports his position. In *Von Gutfeld*, the state's highest court considered whether a citizen's statements made at a public meeting that a lease between the city and a private party was illegal, fraudulent, and "smelled of bribery and corruption" constituted opinion or fact. *Id.* at 131.

Several factors led the court to conclude that the statements were not actionable:

- Von Gutfeld made his comments at a public meeting, a venue that leads a listener to believe "that the speaker is airing a layperson's opinion." *Id.* at 144.

- The statements occurred during "an angry, unfocused diatribe" that was part of a "rambling, table-slapping monologue" such that the statements could not "reasonably be heard as a factual presentation[.]" *Id.*

20

- Von Gutfeld's use of "the colloquial and loose terms 'smells of' and 'fraudulent as you can get'" are phrases that "convey[] to listeners that he has no hard facts, only generalized suspicions." *Id.* at 143.

- The court also noted that his statement lacked any specific reference to the plaintiff and did not imply "knowledge of a specific criminal transaction, let alone the plaintiff's involvement in such conduct." *Id.*

Rather than help Cartman's case, *Von Gutfeld* shows that his statement was fact, not opinion. As noted above, Cartman made his statement in a venue where readers can expect to factual content.

In terms of formality and tenor, Cartman's statements were not part of "an angry, unfocused diatribe" or a "rambling, table-slapping monologue." Instead, they are much more measured. This is particularly true when comparing Cartman's statement with the other statements attached to the complaint. Unlike his fellow defendants, Cartman's statement does not include excessive capitalization, multi-colored text, or an overabundance of exclamation points. *Compare* Compl. Ex. I *with* Compl. Ex. A-H.

Plus, Cartman's paid pump comment was a factual statement that he used to support his opinion about CCTI's management. Cartman begins by questioning whether CCTI's management follows the law. Compl. ¶ 43 ("As if 'because it's the law has ever been management's guiding force."). He rejects this statement ("What a joke. They must think the shareholders are morons[.]"), and he does so because, he claims, that CCTIs management (along with Sandoval) engaged in a paid pump scheme "last fall." *Id.* A reader would understand that Cartman's opinions about management are based on the assertion that the paid pump actually occurred.

And Cartman's statement directly ties Sandoval to management's untoward conduct. So, unlike *Von Gutfeld*, his statement suggests "that he has undisclosed knowledge of an[] actual transaction involving" Sandoval. *Id.* at 144.

21

The statements here are much more like those in *Kesner* v. *Dow Jones & Co., Inc.*, 515 F. Supp. 3d 149, 182 (S.D.N.Y. 2021). In *Kesner*, the court was addressing a motion to dismiss certain defamation claims. While the court granted the motion as to some claims, it denied the motion as to others. *Id.* at 193. Among the statements that survived was a tweet accusing the plaintiff of engaging in "illegal back room deals and intimidation" with a company. *Id.* at 182. The court held that "This accusation of criminal conduct is plausibly pled as defamation per se." *Id.* Another defamation claim that went forward alleged that "shares were transferred within an insider's family in a manner that might skirt beneficial-ownership rules." *Id.* at 186.

Cartman's statement is analogous to the actionable statements in *Kesner*. They both generally allege that their targets were engaged in illegal financial transactions. So the court finds that, at this point, the statement should be considered fact instead of opinion.

### 2.    The complaint plausibly alleges that Cartman's statement was false.

Cartman also argues that Sandoval has failed to show the statement is false. But since the court is focusing on whether Sandoval has stated a claim for defamation it must take the complaint's allegations as true. *See Iqbal*, 556 U.S. at 678. This includes Sandoval's allegations that Cartman's statement is false. Compl. ¶ 72. While Cartman claims that Sandoval's statement is conclusory and should not be taken as true, the court disagrees. Sandoval's position is that he never engaged in any form of market manipulation, including a pump and dump scheme. Compl. ¶ 72. Given the lack of details in Cartman's statement, there is nothing more Sandoval could say to show the statement is false. So Sandoval has plausibly alleged that Cartman's statement is false.

22

3.    **Although Sandoval need not meet New York's gross irresponsibility standard since Cartman is not a media member, the complaint's allegations satisfy that standard.**

The parties next dispute whether Sandoval must show that Cartman acted in a grossly irresponsible manner when he made his statements and whether Sandoval has met that standard. This argument arises from the New York Court of Appeals' decision in *Chapadeau* v. *Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196 (N.Y. 1975). In *Chapadeau*, the state's highest court held that when the content of an allegedly defamatory statement "is arguably within the sphere of legitimate public concern," a plaintiff must show that the statement was made in a grossly irresponsible manner. *Id.* at 199. This standard requires showing that the speaker acted "without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Id.* Cartman claims that *Chapadeau* applies here and that Sandoval's allegations do not meet its standard. In response, Sandoval both attacks *Chapadeau*'s applicability and the claim that his allegations cannot satisfy its requirements.

Sandoval argues *Chapadeau* applies only when the speaker is a media member. And since, as far as anyone can tell, Cartman is not a media member, Sandoval says *Chapadeau* does not apply.

Sandoval is correct about *Chapadeau*'s origin. The defendant in that case was a newspaper that allegedly defamed a local schoolteacher. *Id.* at 197. And the holding of the case was that "where the content of the *article* is arguably within the sphere of legitimate public concern" a defamation plaintiff "must establish, by a preponderance of the evidence, that the *publisher* acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." *Id.* at 199 (emphasis added). So *Chapadeau*'s immediate focus was on the media. And the court has not located a case

23

in which the New York Court of Appeals has applied *Chapadeau* in a case involving a non-media defendant.

But other courts have. State and federal courts in New York regularly apply *Chapadeau* in any case involving matters arguably within the sphere of legitimate public concern, no matter who is the defendant. *See Konikoff* v. *Prudential Ins. Co. of Am.,* 234 F.3d 92, 94 (2d Cir. 2000) ("Courts applying New York law have, however, uniformly applied *Chapadeau* to cases involving non-media defendants[.]"). *But see Gottwald* v. *Sebert*, 148 N.Y.S.3d 37, 45 (N.Y. App. Div. 2021) ("Plaintiffs are not required . . . to show that Kesha acted in a 'grossly irresponsible' manner, since Kesha is not a media publication, broadcaster or journalist responsible for observing 'the standards of information gathering and dissemination ordinarily followed by responsible parties.'").

Yet no matter what other courts have done, federalism principles prohibit a federal court operating under its diversity jurisdiction from extending state law beyond the set by that state's highest court. *Burris Chem., Inc.* v. *USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993) ("[T]he federal courts sitting in diversity rule upon state law as it exists and do not surmise or suggest its expansion."). So since the New York Court of Appeals has not extended *Chapadeau* to non-media defendants, this court will not either.

Nevertheless, even if *Chapadeau* did apply, Sandoval's complaint satisfies the grossly irresponsible standard. Federal courts in New York have explained that, "[i]ntentional lies not only satisfy, but surpass, the culpability of "gross irresponsibility," which signifies "something more than . . . negligence." *Goldman* v. *Reddington*, 417 F. Supp. 3d 163, 175 (E.D.N.Y. 2019) (alteration in original). Sandoval has alleged that Cartman made his allegedly defamatory statement, "with knowledge that the statement was false" and that he engaged in "intentional and malicious publication" of it. Compl. ¶ 70, 74. New York courts have found these allegations

24

sufficient to meet *Chapadeau*'s requirements at the motion to dismiss stage. *See Watson* v. *NY Doe 1*, 439 F. Supp. 3d 152, 164 (S.D.N.Y. 2020) (finding allegations that a defendant "made the statement with full knowledge of [its] falsity" satisfies *Chapadeau* at the motion to dismiss stage); *Goldman*, 417 F. Supp. 3d at 175 (rejecting a *Chapadeau* challenge when the complaint repeatedly alleged the defendant knowingly and intentionally made false statements). Thus even if Sandoval needed to satisfy *Chapadeau*, he has done so. Therefore this argument does not supply a basis to quash the subpoena.

### 4. The complaint's allegations plausibly allege that Cartman's statement can support a defamation per se claim.

Carman's final argument is that his statement, if defamatory at all, is not defamatory per se. As is relevant here, a statement is defamatory per se if it "charge[s] plaintiff with a serious crime" or "tend[s] to injure another in his or her trade, business or profession." *Liberman* v. *Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992). Sandoval alleges that Cartman's statement charges him with engaging in "illegal securities fraud" (Compl. ¶ 44) and that it has damaged his professional reputation and caused people to stop doing business with him (Comp. ¶ 73).

Cartman argues that since his statement did not explicitly claim that Sandoval dumped his shares after the paid pump, he has not alleged that Sandoval violated securities laws by engaging in a pump and dump scheme. And Cartman claims that if Sandoval is relying on a defamation by implication theory, he has not sufficiently alleged such a claim.

It is true that Cartman's statement does not explicitly say that Sandoval engaged in both pumping and dumping of shares. But Sandoval's defamation per se claim against Cartman is based on more than a potential pump and dump scheme. Sandoval says that the statement is defamatory per se because it would cause a reader to believe that he "participated in illegal securities fraud

with [CCTI] by manipulating the company's" share price through the paid pump. Compl. ¶ 44. And while asserts that he was not involved in any "'pumping' or 'dumping' of his shares," this statement is part of his broader denial of involvement with "any form of market manipulation[.]" *Id.* ¶ 72.

Cartman does not explain why these allegations about market manipulation cannot support a defamation per se claim based on a violation of criminal law. And there are a variety of ways that manipulation of securities prices can violate the law. *See* 15 U.S.C. §§ 78j & 78i.

Even if the court were to accept that Cartman's statement does not charge Sandoval with committing a serious crime, Cartman has not addressed the allegation that the paid pump comment has impacted Sandoval's business reputation and caused people to be unwilling "to conduct business with him[.]" Compl. ¶ 73. As noted above, that allegation provides an independent basis for a defamation per se claim.

Cartman also argues that a reader would have to imply that Sandoval engaged in illegal conduct and the complaint does not state a claim for defamation by implication. Under New York law, to state a claim for defamation, a plaintiff must make an "especially rigorous showing" of two things. *Biro* v. *Conde Nast*, 883 F. Supp. 2d 441, 466 (S.D.N.Y. 2012) (quoting *Chapin* v. *Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993)). First, that "the language may be reasonably read to impart the false innuendo[.]" *Id.* And second that "the author intends or endorses the inference." *Id.*

If Sandoval needs to allege defamation by implication to establish his defamation per se claim, he has done so. The paid pump is the reason Cartman believes that CCTI's management does not follow the law. So by linking Sandoval to the paid pump, he has tied him to illegal conduct by CCTI's management. This implication would be easily understood by a reasonable reader. And

26

the tone of Cartman's statement along with the use of the term "slimy insider" establishes that Cartman intended to imply Sandoval's involvement in illegal activity. While Cartman may claim there is a more innocent interpretation of his remarks, the court is bound to draw all reasonable inferences in Sandoval's favor at this stage of the proceeding. *See Burbach Broad. Co. of Del.* v. *Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002). So the court finds that Sandoval could support his defamation per se claim through defamation by implication. Thus this argument does not provide a basis to quash the subpoena.

## III. Conclusion

So for the reasons stated above, the court denies Cartman's motion to quash. D.E. 18. iHub must respond to the subpoena within 7 days after Sandoval serves it with a copy of this order.

The court also orders that the parties may not publicly disclose Cartman's name or identifying information without Cartman's consent or further order from this court. This restriction is necessary to ensure that Cartman's loss of his right to anonymity goes no further than necessary to advance the substantial governmental interest that justified the disclosure of the information.

Dated:  November 30, 2021

_Robert T Numbers II_

Robert T. Numbers, II
United States Magistrate Judge

27